Filed 9/9/14  In re R.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065715 |
| Plaintiff and Respondent, | (Super. Ct. No. J518858) |
| v. | |
| RYAN M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Ryan M. appeals a judgment declaring his three-month-old daughter, R.M.,[1] a dependent of the juvenile court under Welfare and Institutions Code[2] section 300, subdivision (b), removing her from parental custody under section 361, subdivision (c)(1), and requiring visitation be supervised. Ryan challenges the sufficiency of the evidence supporting the court's jurisdictional findings and order and contends the court abused its discretion by removing R.M. from his custody and requiring visitation be supervised. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On December 27, 2013, the San Diego County Health and Human Services Agency (Agency) filed a petition on behalf of three-month-old R.M. under section 300, subdivision (b). The petition alleged R.M. suffered, or there was substantial risk she would suffer, serious physical harm or illness because she had been diagnosed with "failure to thrive," which was likely caused by her parents' failure to provide her with adequate nutritional intake and their failure to follow through on learning how to meet R.M.'s special medical needs. The petition further alleged the parents' failure to provide R.M. with her required care and treatment placed her at continued risk of medical neglect and substantial risk of harm.

---

[1]     Ryan is R.M.'s presumed father.

[2]     All further statutory references are to the Welfare and Institutions Code.

The parents have a history with child welfare services (CWS). R.M.'s mother, Patricia S., has three other children older than R.M.[3] In 2010, Patricia's parental rights to her eldest son were terminated. In January 2013, Patricia had a dependency case based on neglect of her daughter, Z.S. Although that case was closed as unfounded, Z.S. is now reportedly in a legal guardianship with Patricia's aunt.

R.M. was the subject of three CWS referrals in 2013, none of which were classified as "founded" after investigation. In 2013, however, Riverside County enacted a safety plan that informally placed R.M. and her brother, Ry.M., in Ryan's primary custody. Despite that arrangement, Ryan and Patricia continued to coparent and both had custody of R.M. and Ry.M.

The parents then moved to Louisiana with R.M. and Ry.M., where the local CWS agency opened an investigation for suspected medical neglect of R.M. The Louisiana agency reported R.M. was seen wheezing and coughing, but the parents did not seek medical care. The parents then took R.M. to the emergency room for her breathing issues, but the doctor there never mentioned anything about her weight. The parents moved back to California with R.M. and Ry.M. in December 2013 before the Louisiana agency completed its investigation.

Once back in San Diego, on December 20, 2013, Ryan took R.M. to the Euclid Medical Center for her respiratory issues and was told to take her to urgent care. Urgent care referred R.M. to Rady Children's Hospital (Rady) because of her small size.

---

3      Neither Patricia nor her other children are parties to this appeal. We discuss them only as they are relevant to Ryan's appeal.

When admitted to Rady on December 20, 2013, R.M. weighed only eight pounds, twelve and one-half ounces, gaining only slightly over two pounds since her birth in September 2013. She was measured at the 19th percentile in average height and the 0.07th percentile in average weight for an infant her age. The staff at Rady noted R.M. presented with poor weight gain, vomiting, and appeared very thin with little subcutaneous fat. One of Rady's doctors, Lisa Benz, began observing R.M. and noticed she was very withdrawn and did not engage with the hospital staff. R.M. would not soothe, and the only way she could calm herself was by crying herself to sleep. Dr. Benz concluded that R.M. had learned crying would not get her needs met. R.M. also had severely elevated liver enzymes from malnourishment, and hospital staff noted R.M. had not been seen by a pediatrician since her birth.

The parents reported to hospital staff that R.M. would vomit or spit up 75 percent of her food, and they were instructed in Louisiana to supplement her formula with Pedialyte if her vomiting continued. After that, the parents began switching out every other bottle of formula for Pedialyte. Patricia reported she would also dilute the formula. Ryan admitted to feeding R.M. just water, and Patricia also tried giving her water while at the hospital. However, when asked about R.M.'s water intake, Patricia denied ever feeding her just water, and both parents then denied ever diluting the formula.

As Dr. Benz monitored R.M.'s feedings, she diagnosed R.M. with failure to thrive, likely due to poor caloric intake from her parents mixing her formula incorrectly. R.M. had also been observed vomiting when she was first admitted, however, that quickly subsided likely as a result of Dr. Benz's recommended reflux precautions, including

4

holding R.M. upright during feeding. Dr. Benz ruled out any suspected organic causes for R.M.'s failure to thrive and also noted that the parents' unstable living situation may have contributed to R.M.'s poor caloric intake.

Dr. Benz discussed with Patricia that before R.M. could be discharged from the hospital, she needed to be eating well with good weight gain, and she needed to be fed only by those who would feed her at home. She informed Patricia that R.M. needed to be fed every three hours, and "[t]hey could skip the 3[a.m.] feeding *if* the nurse at the time said it was ok." Dr. Benz set a goal for the parents exclusively to feed R.M. for 24 consecutive hours to show they could handle the feedings.

While hospitalized, R.M. did well with her feedings, vomited less, and gained weight. She started looking around, cooing, reaching for toys, and was able to be soothed when held. Although Ryan appeared to do better with feedings, Patricia did not regularly engage with the nurses to help with feeding. On one occasion, Patricia did not want to wake up for the 3:00 a.m. feeding when the nurse was too busy to do it. Patricia told the nurse, "That's your job" and went back to sleep. Both parents were generally upset that the nurses kept waking R.M. every three hours to feed her.

The parents had also not obtained medical insurance to arrange for a primary care doctor for R.M. Patricia refused to work with the financial counselor at the hospital who tried to help her obtain MediCal. Patricia seemed very guarded regarding the family's social situation—they were frequently homeless—and the parents would not provide an address at which they would be staying with R.M. after her discharge.

5

On the night of December 24, the parents were at the hospital for only one hour and left without feeding R.M. They said they would be at the hospital the next day, but did not show up.

On December 25, Dr. Benz concluded R.M. was improving and could be treated as an outpatient by the failure to thrive clinic. She noted that although R.M. was medically stable for discharge, the parents were not demonstrating an ability or willingness to learn about R.M.'s medical needs, had not achieved their 24-hour feeding goal, were not present at the hospital most of December 24 or 25, did not call to check on R.M., and could not be reached at the phone numbers they provided. Therefore, the Agency placed a hold on R.M.'s discharge from Rady.

Upon learning of the hospital hold, R.M.'s parents became agitated and aggressive with hospital staff and were asked to leave. They did so without providing any contact information. During a subsequent interview with a social worker at Rady, Ryan frequently cut her off, refused to answer her questions, interrupted her interview of Patricia, and threatened to sue the County of San Diego. Ryan accused the Agency of switching out people's babies, claiming the Agency "likes to take beautiful black children." He maintained he always knew how to feed R.M. and did not need anyone to teach him. Ryan stated he and Patricia had done no harm to R.M. and had done everything they were supposed to do.

On December 26, Ryan called social worker Kelly Rollins to ask about R.M.'s status. When Rollins explained the Agency's concerns for R.M., Ryan again became highly agitated and interrupted Rollins, claiming the parents did nothing wrong. When

6

asked in a later interview to explain R.M.'s medical needs, Ryan said she was healthy and nothing was wrong. Ryan said he should not be blamed for Patricia's mistakes since R.M. and Ry.M were in his care. Although he identified himself as the primary parent, Ryan acknowledged he was not going to keep Patricia from her children. Ryan expressed frustration in not being able to obtain health insurance and CalWorks. Ryan's car broke down and he and Patricia were staying at a motel because they did not have a permanent residence.

At the detention hearing on December 30, 2013, the juvenile court made a prima facie finding the petition was true as alleged. The court ordered that R.M. be detained at Polinsky Children's Center (Polinsky), to which she had been transferred in the interim, with discretion to detain her in foster care or with a relative. The court ordered voluntary services be made available to the parents.

After the detention hearing, the parents' supervised visits with R.M. at Polinsky went well. The parents followed the feeding protocol and sought constructive feedback.

After R.M. was moved to foster care in January 2014, the parents' visits occurred at the CWS office and were supervised by the foster mother. At the end of the first visit there, the parents met with Agency social worker Rollins. The conversation began in a respectful and calm manner, but escalated quickly with both parents becoming argumentative and raising their voices at Rollins. The parents claimed everyone was lying about their parenting skills and everyone at the hospital was "in on this." The parents were further agitated when Rollins reviewed the voluntary services available to them, which included anger management for Ryan. When asked about their living

7

arrangements, the parents explained they were staying with friends who did not want to have their address disclosed to CWS. Rollins explained the need for the parents to identify and maintain a stable residence to help provide R.M. with consistent feedings, and also so the Agency could continue to monitor her care. Ryan replied they were working on finding a place to stay, but both parents declined shelter referrals. At times, the conversation became so heated that building security checked on Rollins's safety. Rollins ended the visit because of the parents' behavior and provided Ryan with a referral to anger management and Patricia with a referral to counseling.

By early February, R.M. weighed 10 pounds, 10 ounces, and was slowly gaining weight. The parents continued to visit her twice each week, but Ryan still needed to prompt Patricia with feedings. Rollins had trouble reaching the parents when attempting to get updates on their living situation and information about relatives for potential placement. The parents were referred to parenting classes at Social Advocates for Youth (SAY), but were combative and angry and, thus, were initially unable to complete the intake process. They later told their SAY counselor they were no longer staying with friends, but would not disclose where they were staying, only that they were panhandling for money. The parents received resources for a shelter, but never went.

During a supervised visit in early February, Rollins again provided the parents with resources for shelters and encouraged them to stay at one because the Agency would not return R.M. to the parents' care until they had stable housing. Ryan still had not enrolled in anger management treatment because he felt it had nothing to do with his

parenting of R.M. Rollins explained it related to R.M. because Ryan's behavior toward service providers was making it difficult for service delivery.

In late February, the Agency received a referral stating the police responded to a domestic violence call from Ryan. The parents were arguing in their car in front of Ry.M. and Patricia reportedly grabbed him from his car seat during the argument.[4] The parents stopped cohabiting because of their arguing.

By early March, R.M. weighed 12 pounds, 4 ounces, and the parents' supervised visits continued to go well. Ryan still had not enrolled in anger management treatment and stated he had no intention of doing so because he had done nothing wrong in caring for R.M.—he felt he only needed to secure stable housing. He had been staying in a motel with his girlfriend, but would not provide the Agency with the name or location of the motel because he did not want the Agency to make unannounced visits.

Meanwhile, the parents were making "no progress whatsoever" in their SAY parenting sessions because the parents were still combative and spent their time addressing their relationship issues instead of parenting skills. The counselor decided to proceed with separate counseling sessions, with the admonition that if those were not successful, SAY would close its case.

---

4    The Agency moves to augment the record to include reports the Agency filed subsequent to the judgment in this case that show the Agency filed a petition on Ry.M.'s behalf under section 300, subdivision (b), because of the parents' inability to protect him from exposure to domestic violence. Ryan opposes the motion. We deny the Agency's motion because the reports were not before the juvenile court when it rendered the judgment (*In re A.B.* (2008) 164 Cal.App.4th 832, 843) and, in any event, we find the materials unnecessary to our resolution of this appeal.

On March 26, 2014, the court held combined, contested jurisdiction and disposition hearings. The court received in evidence the Agency's jurisdiction/detention report and addenda, and heard live testimony from Rollins and Dr. Benz. The Agency recommended (1) the juvenile court sustain the petition and assume jurisdiction over R.M., (2) R.M. be removed from parental custody and placed in foster care, (3) the parents be ordered to comply with family reunification services, and (4) the parents be restricted to supervised visitation. Rollins testified these recommendations were based on the parents' lack of residential stability, lack of access to insurance, limited transportation, prior protective referrals, and lack of participation and progress in services. The juvenile court followed the Agency's recommendations.

Ryan timely appealed.

I

*JURISDICTION*

Ryan contends the evidence is insufficient to support the juvenile court's jurisdictional findings and order. The thrust of his argument is that the concerns the Agency expressed in the petition regarding R.M.'s failure to thrive "were not valid four months later when the juvenile court sustained the petition."

A.      *Summary of Applicable Legal Principles and Standard of Review*

At the jurisdictional hearing, the juvenile court determines whether the child is described by one or more subdivisions of section 300. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.) Under section 300, subdivision (b), the Agency must show by a preponderance of the evidence that the parent's neglectful conduct has caused the child to

10

suffer serious physical harm or illness, or creates a substantial risk that the child will suffer such harm or illness. (§§ 300, subd. (b), 355, subd. (a).)

We review jurisdictional findings under the substantial evidence standard of review. (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) "We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order, and affirm the order even if other evidence supports a contrary finding." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133 (*T.V.*).) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*Ibid.*)

B.    *Analysis*

Ryan contends that by the time of the jurisdictional hearing R.M. was no longer at risk of suffering serious physical or illness from her failure to thrive because, "[b]etween detention and jurisdiction, with perfect aptitude and precision, [Ryan] 'followed through' " and "demonstrated perfectly his ability to provide [R.M.] adequate nutritional intake . . . ." Ryan points to Rollins's testimony that he was knowledgeable regarding the appropriate feeding protocol, "appeared to be attentive to the quantity of formula that [R.M.] was consuming," and was "aware to keep her at an appropriate angle and then burp her at appropriate intervals." We are not persuaded.

11

Although the evidence Ryan cites demonstrates he progressed with respect to properly administering a feeding, it does not address his ability to consistently ensure feedings are administered with appropriate frequency. Substantial evidence supports the contrary conclusion. At Rady, Ryan was upset with the frequency with which hospital staff woke R.M. for feedings. Similarly, Ryan did not achieve Dr. Benz's goal that he and Patricia exclusively feed R.M. for 24 consecutive hours. The fact that Ryan insisted there was "nothing wrong" with R.M. demonstrates his lack of appreciation for the severity of the risk R.M.'s failure to thrive presented.

Substantial evidence also supports the conclusion that Ryan's unstable housing situation contributed to the risk of continuing injury or illness to R.M. Dr. Benz testified unstable living conditions are a factor in an infant's failure to thrive. Rollins testified Ryan needed a stable residence so the Agency could continue to monitor R.M.'s care. Ryan's housing was not only unstable—bouncing between motels, friends' houses, and homelessness—but when he did have housing he frequently refused to provide his contact information to the Agency and was difficult to contact. Although Ryan could have attained residential stability with the several shelter referrals the Agency offered, he repeatedly declined.

Ryan did not engage in the additional voluntary services the Agency offered. He never engaged in anger management treatment—and stated he had no intention of ever doing so—even when Rollins explained his hostile behavior interfered with the effective delivery of services. Rollins would even have allowed Ryan to have individual anger management therapy instead of the usual group modality. Demonstrating his hostility

12

was a barrier to receiving services, Ryan made "no progress whatsoever" in his SAY parenting sessions because he was combative with the counselor and Patricia. Ryan's combative behavior even manifested itself during the contested hearing when Ryan interrupted the judge's announcement of his ruling to complain that Rollins was "not playing fair."

In addition, even though the parents were no longer cohabiting at the time of the contested hearings, Ryan did not acknowledge the risks Patricia posed to R.M. Despite Patricia's extensive dependency history and failure to progress during the dependency, Ryan said she was "on her A game" with parenting and he would not keep the children from her.

These circumstances establish that substantial evidence of a current risk of injury or illness to R.M. existed at the time of the jurisdictional hearing and support the juvenile court's findings and order.[5] We are also satisfied that these circumstances are sufficiently related to the petition's allegations and Ryan had adequate notice of the basis of the Agency's case. (*T.V., supra,* 217 Cal.App.4th at p. 131 ["There is no requirement . . . that Agency 'regurgitate the contents of the social worker's report into a petition.' "].)

---

[5] We find it unnecessary to address Ryan's argument that *In re J.K., supra,* 174 Cal.App.4th 1426 was wrongly decided to the extent it stands for the proposition that a juvenile court may assume jurisdiction over a minor based solely on past conduct.

II

*REMOVAL*

Ryan contends that even if the court properly found jurisdiction, it nonetheless erred by removing R.M. from his custody when less drastic alternatives were available.

A.    *Summary of Applicable Legal Principles and Standard of Review*

"Before the court may order a child physically removed from his or her parent's custody, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal." (*T.V., supra,* 217 Cal.App.4th at p. 135; § 361, subd. (c)(1).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136.) "In this regard, the court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *T.V.*, at p. 133 ["A parent's past conduct is a good predictor of future behavior."].) "Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*In re Cole C.*, at p. 918.)

B.    *Analysis*

The same evidence that supports the juvenile court's jurisdictional findings is also sufficient to support the dispositional findings by clear and convincing evidence that there is or would be a substantial danger to R.M.'s physical health or safety were she not removed from Ryan's custody. (§ 361, subd. (c)(1).) Ryan had not demonstrated an

14

ability to independently follow an appropriate feeding schedule; did not have insight into, or was in denial about, R.M.'s health; had unstable living conditions despite several shelter referrals; was difficult for the Agency to contact; refused to avail himself of services the Agency offered; had untreated anger management issues; and did not have appreciation for the risks of exposing R.M. to Patricia's parenting.

Ryan contends the juvenile court abused its discretion by not considering the less drastic alternatives of (1) without adjudicating R.M. dependent, ordering informal services (§ 360, subd. (b)); or (2) adjudicating R.M. dependent, but leaving her in Ryan's care with family maintenance services (§ 362). The juvenile court did not abuse its discretion by not selecting either of these alternatives.

"Under section 360, subdivision (b), if appropriate, the court may, without adjudicating the child a dependent, order that services be provided to keep the family together under the informal supervision of the child welfare agency." (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.) "Whether to exercise this option . . . is a discretionary call for the juvenile court to make; it may opt to do so, but it need not." (*Ibid*.) Considering Ryan's persistent refusal to avail himself of, or meaningfully participate in, the services offered by the Agency during the dependency, we conclude the juvenile court did not abuse its discretion by not selecting informal supervision as the disposition.

Ryan's refusal to engage in services, together with his untreated anger management issues, which Rollins concluded impeded the delivery of services, also undermine Ryan's claim that the juvenile court should have placed R.M. with him subject to family maintenance services. Moreover, Riverside's CWS agency tried essentially the

15

same thing—to no avail—when Ryan assumed informal custody of R.M. following the October 2013 team decision meeting. The juvenile court did not abuse its discretion by not invoking a disposition substantially similar to one that had already failed.

III

*SUPERVISED VISITATION*

Ryan contends the juvenile court abused its discretion by ordering supervised visits. "One of the dependency court's responsibilities is to define the rights of the parties to visitation by balancing the rights of the parent with the best interests of the child." (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) "We review an order setting visitation for abuse of discretion." (*Ibid.*)

The juvenile court performed that balancing test here by ordering supervised visits subject to the social worker's discretion to lift that supervision on an expedited basis. Considering Ryan's unproven track record of caring for R.M., resistance to services, hostile demeanor, and unstable living conditions, we cannot conclude the juvenile court abused its discretion by ordering supervised visits.

## DISPOSITION

The judgment is affirmed.


McDONALD, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.